UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------X
TIMOTHY C. BROWN,

                    Plaintiff,

                    - against -

UNITED STATES OF AMERICA,

                    Defendant.
--------------------------------------------------X

**MEMORANDUM
AND ORDER**

01 CV 3431 (CLP)

On May 29, 2001, plaintiff Timothy Brown[1] filed this action against the United States of

America pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346 ("FTCA"), alleging injuries

suffered during the course of three different pat-down searches conducted by Corrections Officer

Tarik Farag while Mr. Brown was in the custody of the United States Department of Corrections.

Pursuant to the consent of the parties,[2] the liability aspect of the case was tried before the

undersigned magistrate judge on October 14, 2003. In a post-trial motion, dated October 21,

2003, the United States moves to dismiss plaintiff's Complaint pursuant to Rule 12(b)(1) and (6)

of the Federal Rules of Civil Procedure, or, in the alternative, for summary judgment, pursuant to

Rule 56 of the Federal Rules of Civil Procedure. Specifically, defendant argues that: (1) plaintiff

has failed to make out a prima facie case of assault and battery under New York law (Def.'s

---

[1] When the action was originally filed, plaintiff was represented by the Halperin Law
Firm, LLP ("Halperin"). Following discovery, Halperin moved to withdraw as plaintiff's
counsel, and upon entry of a Consent to Change Attorneys dated November 27, 2002, plaintiff
began proceeding pro se in this matter as of January 29, 2003.

[2] On July 8, 2003, the parties consented to trial before the undersigned.

Mem. at 6-9);[3] (2) the doctrine of qualified immunity shields the government from liability where, as here, the government officer acted pursuant to federal regulations (id. at 10-12); (3) plaintiff cannot recover from the United States for negligent hiring and retention because the officer did not commit an intentional tort (id. at 12-13); (4) plaintiff may not maintain causes of action both for negligent infliction of emotional distress and for assault and battery (id. at 13-14); (5) plaintiff has failed to allege conduct sufficiently outrageous and extreme to state a claim for negligent infliction of emotional distress (id. at 15-17); and (6) this Court lacks subject matter jurisdiction over plaintiff's claim for negligent hiring, retention and supervision. (Id. at 18-20).

Based on the testimony presented and the papers submitted, this Court finds in favor of defendant.

## FACTUAL BACKGROUND

A. Testimony of Timothy Brown

At trial, plaintiff, who was then 42 years of age, testified that he was living on Long Island with his common-law wife and five children. (Tr. at 3).[4] At that time, Mr. Brown was running a stucco company, which he described as a "very high-end construction company," and was acting as an administrator for a record company and "various different LLC's." (Id. at 3-4).

The incidents at issue allegedly occurred in December 1998, while Mr. Brown was an

_____

[3] Citations to "Def.'s Mem." refers to the United States of America's Memorandum of Law in Support of its Post-Trial Motion to Dismiss Pro Se Plaintiff Timothy Brown's Complaint, or in the Alternative, for Summary Judgment, dated October 21, 2003, filed by the defendant.

[4] Citations to "Tr." refer to the transcript of the trial proceedings held before this Court on October 14, 2003. Citations to "Pl.'s Ex." and "Def.'s Ex." refer to the trial exhibits introduced by the parties into evidence during the course of the proceedings before this Court.

inmate at the Metropolitan Detention Center ("MDC") in Brooklyn.[5] (Id. at 4). Specifically, plaintiff testified that after entering a plea to one count of aiding and abetting income tax fraud and being sentenced to a term of imprisonment, he surrendered himself to the MDC in September 1998 to begin serving his sentence. (Id. at 4-5).

According to Mr. Brown, because he had no prior criminal history, he was given a job that allowed him to leave the facility. (Id. at 5). Specifically, Mr. Brown's work involved cleaning the lobby of the MDC, including mopping the floors, cleaning the glass, sweeping the front walk of the building, cleaning the bathrooms and taking trash outside of the facility. (Id. at 5-6, 37-38). Plaintiff denied that he was left unsupervised for any period of time while on work detail. (Id. at 38).

Mr. Brown testified that he usually went to work at 4:00 a.m. (Id. at 6-7). Plaintiff explained that once he finished his shift, the duty officer would either bring Mr. Brown back to his unit or escort Mr. Brown to the kitchen, tell him to get something to eat, and then take him back to the unit. (Id. at 7). Plaintiff testified, "[u]nbeknownst to me, this is not a normal practice where an inmate can actually go into the kitchen facility downstairs and get breakfast and come back upstairs with it. This is not normal." (Id.) However, Mr. Brown explained that at the time of the incidents at issue, he was not aware that getting breakfast in the kitchen facility was breaking the rules; he claimed that he was "just following instructions." (Id.) Mr. Brown testified that because he was only supposed to be incarcerated for five months, he figured, "[w]hy should I put myself in harm's way where I can be there longer than the time I'm normally

---

[5] Although Mr. Brown originally testified that the incidents occurred in December 1999 (see Tr. at 4), he later indicated that he had made an error and that the incidents actually occurred in December 1998. (Id. at 23).

3

required to be there?" (Id. at 7-8).

On December 9, 1998, plaintiff completed his work detail and returned to his unit along with several other inmates who had overnight work details inside the building. (Id. at 6). On that morning, Mr. Brown stopped in the kitchen and was returning to his unit with a container of milk and a couple of boxes of cereal. (Id. at 8). According to plaintiff, in order to enter the unit, an inmate must pass through a security gate after exiting the elevator. (Id.) If the door to the unit is closed, the corrections officer on duty must open the door and let the inmate back into the unit. (Id.)

Corrections Officer Tarik Farag[6] was on duty in Mr. Brown's unit on December 9, 1998. (Id.) Plaintiff testified that when he returned from his work shift that morning, Officer Farag opened the door to the unit, came outside, and decided to conduct a pat-search of plaintiff. (Id. at 8-9). Although three or four other inmates were also returning to the unit at the same time as plaintiff, Officer Farag allegedly conducted a pat-search of only Mr. Brown. (Id.)

Plaintiff conceded that he had previously seen other inmates at MDC get pat-searched but denied that these searches occurred "regularly." (Id. at 39). Moreover, Mr. Brown testified that this incident was the first time that he was pat-searched by the duty officer when returning to the unit. (Id. at 9). Rather, plaintiff testified that prior to December 9, 1998, if he was pat-searched at all, the pat-search was conducted by the duty officer who had initially taken plaintiff from the unit. (Id.)

Plaintiff complained that although he had been pat-searched before by several different

---

[6] Although Officer Farag was subsequently promoted to the position of senior officer specialist (Tr. at 44), for purposes of this opinion, he will be referred to as "Officer Farag," the title he held at the time of the alleged incidents.

officers, he had not been pat-searched in "that way." (Id.) Mr. Brown testified, "I felt that it was out of the norm and [Officer Farag] had abused his position, sort of like an abuse of power." (Id.) According to plaintiff, Officer Farag "followed everything as far as the outline is concerned, except that he paid a lot more attention to my groin area than anything else, and in the way that he ran his hands . . . . He ran his hand vertically like this here up the crack of my ass in a motion where it was more aggressive than actually feeling to see if something was there." (Id. at 9-10). Plaintiff also testified that Officer Farag "grabbed my groin." (Id. at 10). At that point, Mr. Brown tried to "move away from the glass because everybody can see from . . . the inside out . . . . [s]o they could see I was in distress during this pat-search." (Id. at 10-11).

When plaintiff asked the officer what he was doing, Officer Farag "didn't say anything at all, he just walked away, he walked back into the unit." (Id. at 11). Mr. Brown walked back into the unit as well. (Id.) According to Mr. Brown, numerous other inmates[7] asked plaintiff why he had been searched by the officer. (Id.) Plaintiff testified that the pat-search "was talked about all day long." (Id.) Mr. Brown "was upset" by the incident and explained that although he should have said something about the search at the time, he was hoping that it was "an isolated incident" and would not happen again. (Id. at 11-12).

On the following day, December 10, 1998, Officer Farag was again on duty in Mr. Brown's unit. (Id. at 12). In the early morning, Officer Farag awoke plaintiff and informed him that the duty officer was there to take plaintiff to his job. (Id.) Mr. Brown testified that he got along well with his duty officer, Lieutenant Bynum, and was hoping that if he told Lieutenant

---

[7] Although plaintiff testified that numerous other inmates witnessed the pat-searches at issue, no witnesses other than the plaintiff and Officer Farag were called to testify.

Bynum about the incident with Officer Farag, Lieutenant Bynum would pat-search plaintiff in front of Officer Farag upon plaintiff's return from his work. (Id.) Apparently, plaintiff decided not to raise the issue with Lieutenant Bynum. (Id. at 40-41).

That morning, following completion of his job, Mr. Brown returned to his unit at 7:00 a.m., as he had the previous day. (Id.) Plaintiff testified that he would "always" return to his unit once the warden, or whoever was in charge of the facility on that particular day, arrived at the facility. (Id. at 12-13). Mr. Brown explained, "[e]very day that I went to work, nine times out of the ten times that I would go to work, I wouldn't even be escorted upstairs. It had become so repetitious that I knew exactly what to do, go into the kitchen, get my breakfast and go back upstairs." (Id. at 13).

On this day, December 10, 1998, Officer Farag again "singled" plaintiff out for a pat-search although other inmates were also returning to the unit at the same time. (Id.) According to Mr. Brown, before Officer Farag began the search, plaintiff warned the officer, "watch how you pat-search me this time." (Id.) On this occasion, Officer Farag instructed plaintiff to turn around and face the wall, a move which plaintiff believed was meant to prevent the other inmates from seeing what Officer Farag was doing to Mr. Brown and from asking questions. (Id. at 13-14).

During the pat-search, Officer Farag found and confiscated a container of milk and a Danish that plaintiff had gotten from the duty officer that morning. (Id. at 14). After confiscating the food, the officer continued with the pat-search. (Id. at 15). According to Mr. Brown, "[o]nce again he tried to aggressively - - in my mind, he was groping me." (Id.) Feeling like the officer "was attacking [him]," Mr. Brown turned around, put his hands up and "asked

6

him what the hell does he think he was doing." (Id.) Again, Officer Farag did not respond to plaintiff's question; instead, he simply walked back into the unit. (Id.) The officer did not speak to Mr. Brown during the search, even when the officer confiscated plaintiff's milk and Danish. (Id.)

Mr. Brown testified that he was not concerned when Officer Farag took his food because it was the responsibility of the duty officer to provide plaintiff with breakfast if plaintiff had not yet eaten. (Id. at 15-16). That morning, however, Officer Farag failed to save breakfast for plaintiff. (Id. at 16). Mr. Brown explained that he was more concerned about the officer's conduct during the pat-search than he was about his lack of breakfast. (Id.)

Plaintiff discussed with some other inmates the possibility of submitting a complaint about Officer Farag's actions but decided against such a submission at that time. (Id.) "Without telling him what was going on," Mr. Brown spoke to the social worker on duty in the unit to try to decide what to do about the incidents. (Id. at 17).

Describing his feelings about the pat-searches, Mr. Brown testified, "I felt victimized, I felt humiliated, I felt I was hurt physically and mentally, I don't know what to do. I never encountered something anywhere remote to this . . . ." (Id.) When asked how he was hurt physically, plaintiff testified that "[p]hysically, I felt some discomfort from him grabbing me . . . ." (Id.) Specifically, plaintiff explained that "[h]e grabbed me. He wasn't searching. He was grabbing me. He was groping me. He was feeling for more than what it was to be felt for, in both instances, the ninth and the tenth." (Id. at 17-18).

The next day, December 11, 1998, Officer Farag's "attitude toward me had definitely changed." (Id. at 16). On this third day, the officer again singled out plaintiff as plaintiff and

7

several other inmates were returning to the unit from work detail. (Id. at 18-19). On this occasion, Officer Farag made Mr. Brown stand spread-eagled against the wall while the officer began to conduct the pat-search. (Id. at 18). However, when Officer Farag reached plaintiff's waist, plaintiff "turned around and told him to his face, I'm not playing your game today, and I walked into the unit. I walked straightaway from him." (Id.) According to Mr. Brown, Officer Farag did not complete the pat-search nor did he write Mr. Brown up for failing to comply with the officer's order. (Id. at 18-19).

The following day, December 12, 1998, was a Saturday. (Id. at 20). Accordingly, Mr. Brown did not report to work and was not pat-searched on that day. (Id.) The next time that plaintiff saw Officer Farag, plaintiff was returning to the unit after his work detail. (Id.) On this occasion, Mr. Brown deliberately avoided the officer by waiting near the elevator until Officer Farag's back was turned and then simply walking into the unit. (Id.) When the officer saw plaintiff, he said, "'Brown, get up to the wall, let me pat-search you' or he said, 'Brown' and then pointed to the wall." (Id. at 20-21). Plaintiff testified that he waved Officer Farag off and said, "'You're not touching me no more. Get out of here. Get somebody else to pat-search me. You're not doing it no more.'" (Id. at 21). According to plaintiff, the officer never pat-searched Mr. Brown again. (Id.)

Plaintiff complained that he "hated going on visits" because he did not like being strip-searched after returning from a visit with a family member or friend. (Id.) During plaintiff's visit with his brother and sister-in-law in January 1999, Officer Farag was in charge of conducting the strip-searches of the inmates who had visitors. (Id. at 22). During the course of conducting a strip-search of plaintiff following this visit, Officer Farag allegedly "had a very

8

nasty attitude . . . . He slammed my pants up against the wall, broke the buttons off them. Slammed the pants so hard that the belt buckle flew off the pants." (Id. at 29).

By the time of this incident in January 1999, plaintiff had already submitted numerous "BP-9's" or "cop-outs" complaining about the way Officer Farag treated plaintiff. (Id. at 22, 24). According to Mr. Brown, he submitted his first BP-9 on December 18, 1998; he submitted a second BP-9, requesting an administrative remedy, on December 30, 1998. (Id. at 23-24; see also Pl.'s Exs. 1, 2).

On January 12, 1999, plaintiff wrote a letter to Assistant Warden A.W. Palmquist complaining about Officer Farag, and on January 25, 1999, he sent a similar letter to Warden Carlisle Holder. (Tr. at 24-25; see also Pl.'s Exs. 3, 4). On January 26, 1999, Mr. Brown filed a Regional Administrative Remedy Appeal, which included several copies of Mr. Brown's BP-9's and his prior letters to the Warden and Assistant Warden. (Tr. at 25; see also Pl.'s Ex. 5). Plaintiff also provided his home address because he was to be released from MDC in two weeks. (Id.) After he was released in February 1999, plaintiff received written correspondence from the Bureau of Prisons Regional Office, indicating that in the Bureau's determination, plaintiff's allegations against Officer Farag were unfounded. (Tr. at 31).

On May 11, 1999, plaintiff received additional correspondence from the Bureau of Prisons Probation Department, directing Mr. Brown to go to Hempstead for counseling services provided as part of his probation. (Id. at 26). There, plaintiff saw Vilma Stade, a psychologist or social worker, in one-on-one counseling sessions. (Id.)

On cross-examination, plaintiff admitted that other than the counseling ordered by the Probation Department, he never sought medical or psychological treatment after the alleged

incidents with Officer Farag. (Id. at 40-41). Plaintiff also acknowledged that he did not complain to any MDC staff member after any of the incidents at issue.[8] (Id.) On redirect, plaintiff explained that he did not seek any medical or psychological attention and did not speak to anyone at MDC because the incidents at issue were "a harrowing experience" that he felt he could better express in writing. (Id. at 42-43).

## B. Testimony of Officer Tarik Farag

Defendant called Officer Farag to testify. (Id. at 43). According to the officer, at the time of trial, he had been employed by the Bureau of Prisons ("BOP") for five and a half years. (Id. at 43). In December 1998, Officer Farag was hired as a corrections officer, the position he held until his promotion to senior officer specialist approximately a year before the trial. (Id. at 44, 73). The officer began his work at the MDC in April 1998 and was accordingly still in a probationary period when the incidents at issue allegedly occurred in December 1998. (Id. at 72-73).

Officer Farag testified that as part of the general training received by federal corrections officers, he received training on how to conduct a pat-search of an inmate. (Id. at 44-45). In connection with the training, Officer Farag received an introductory correctional training program manual issued by the BOP. (Id. at 45-46; see also Def.'s Ex. A (Institutional

---

[8] In contrast to his testimony, in the BP-9 that he submitted on December 18, 1998, plaintiff describes the alleged incidents with Officer Farag and states that "[Lieutenant] Nared, [Lieutenant] Little and [Lieutenant] Bynum are aware of this sensitive situation." (Pl.'s Ex. 1 at 2). Also, in the B-9 filed on December 30, 1998, Mr. Brown claims that "[o]n 12/16/98[,] I wrote a cop out to [Lieutenant] Nared (which has not been returned). [On] 12/17/98, I wrote a cop out to [Lieutenant] [L]ittles (which has not been returned)." (Pl.'s Ex. 2 at 1).

Familiarization Program Participant Manual, Module: Search Procedures, Lesson 1: Conducting Pat Search (the "Manual"))). Among other things, the Manual describes the purpose of a pat-search, when to conduct a pat-search and the step-by-step method for conducting a pat-search. (Tr. at 47-49; see also Def.'s Ex. A).

According to the Manual, the purpose of a pat-search is "to protect staff and inmates by detecting and preventing the movement of contraband within the institution." (Tr. at 48; see also Def.'s Ex. A). When asked what constitutes "contraband," Officer Farag testified that "contraband" consists of "narcotics, weapons, food, extra linen, among other things" and includes anything "unauthorized by the Bureau of Prisons." (Tr. at 48). The Manual also provides that inmates may be pat-searched "several times a day at nonscheduled intervals," including when an inmate moves from one area of the institution to another, leaves a work assignment, or returns to the supervision of the MDC staff. (Id. at 48-49; see also Def.'s Ex. A).

When asked to describe his understanding of how a pat-search is supposed to be conducted, Officer Farag explained, "first, I would instruct that inmate to place his hands on the wall above his head. I would instruct the inmate to spread his legs apart." (Tr. at 50). Starting with the inmate's wrists, the officer would then "pat-down" the inmate in a "sweeping motion," moving from the wrists down to the inmate's shoulders on both right and left sides. (Id.) Using both hands, Officer Farag would next pat-down the inmate from his neck down to his chest and pat-down his back from his neck to his waist. (Id.)

The officer testified, "I would then check the waistline of the inmate, then place my hands below the inmate's buttocks on the legs, both hands right below the inmate's buttocks and pat-down the leg from below the buttocks to the ankle, both the right and the left leg." (Id.) The

11

Manual specifically explains that the search of an inmate's leg involves "running your hands down from the waist to the feet, paying special attention to the inmate's lower abdomen and crotch, carefully checking seams, waistbands, zippers and buttons." (Id. at 51). Officer Farag conceded that when conducting a pat-search, an officer's hands could come into contact with an inmate's buttocks or groin area. (Id.)

Officer Farag testified that he was familiar with Mr. Brown, who was assigned to Housing Unit 2 South ("Unit 2 South") of the MDC during his incarceration at MDC. (Id.) However, Officer Farag did not specifically recall the incidents which allegedly occurred on December 9, December 10 and December 11, 1998. (Id. at 69). Nor did he recall when he first learned of plaintiff's allegations regarding these incidents.[9] (Id.)

Although the officer recalled performing a pat-search on Mr. Brown on "multiple occasions" (id. at 52), he could not recall any of the specific dates on which he pat-searched Mr. Brown. (Id. at 54). Indeed, on direct examination, the officer was not certain when he was assigned to Unit 2 South or whether he was assigned to Unit 2 South in December 1998, when the pat-searches at issue allegedly occurred. (Id. at 61-63).

However, on cross-examination, Officer Farag admitted that an officer at MDC is usually assigned to a particular unit for approximately three months, and that he was "possibly" assigned to Unit 2 South during the period from September 1998 through February 1999, the five months during which plaintiff was housed in that unit. (Id.) The officer conceded that during the time he was stationed on Unit 2 South, he probably worked the "night shift," from 12:00 a.m. to 8:00

_____

[9] As a part of an internal investigation into Mr. Brown's allegations, the officer was interviewed by the SIS investigative unit of the BOP but never learned of the outcome of the investigation. (Tr. at 69-70).

12

a.m. (Id. at 63). He also admitted that he may have worked a double shift on occasion and that he did work in the visiting room "several times" between when he was hired in April 1998 and February 1999. (Id. at 73-75).

According to Officer Farag, plaintiff's duties as a sanitation orderly "authorized [Mr. Brown] to be outside the institution for up to two hours unsupervised."[10] (Id. at 52). As Officer Farag explained, MDC procedure requires that "[a]ny inmate upon entering the institution - - the housing unit [- -] was to be pat-searched" (id. at 52), and accordingly "[e]very inmate that returned from a daily [work detail] would [be] pat-search[ed]." (Id. at 71). According to the officer, he pat-searched plaintiff in the manner instructed by the Manual, which was the same way that he searched all inmates. (Id. at 54-55). Like all inmates, he searched plaintiff in front of plaintiff's housing unit while other inmates were present. (Id. at 53).

Officer Farag conceded that in the process of searching Mr. Brown, he might have touched Mr. Brown's genital area. (Id. at 55). However, the officer denied ever groping plaintiff in his groin area or running his hand in between plaintiff's buttocks when conducting a pat-search of plaintiff. (Id. at 77-78). Explaining plaintiff's reaction to the officer's pat-searches, the officer testified that "Mr. Brown was completely irritated every time I searched him and complained about it." (Id. at 55).

On cross-examination, Officer Farag conceded that for religious or medical purposes, some inmates are allowed to eat their meals after the designated meal times. (Id. at 59). The officer also explained that because breakfast is served between 5:00 a.m. and 6:30 a.m., an

---

[10] On cross-examination, the officer conceded that although plaintiff was technically "unsupervised" during certain periods of time, surveillance cameras monitor all parts of the building, and correction officers patrol the building on intervals. (Tr. at 65-66).

13

inmate who does not return from his work detail until 7:00 a.m. would usually eat breakfast on the unit before starting his shift. (Id. at 59-60). Officer Farag did not recall, however, whether plaintiff ate his breakfast on the unit prior to his work detail, which began at 4:00 a.m. (Id. at 60). The officer did remember that "[o]n multiple occasions," he confiscated contraband, including danishes and other food products not sold within the institution, from Mr. Brown. (Id. at 55-56).

Officer Farag explained that if an inmate refused to submit to a pat-search, the officer would write up an incident report for the inmate's "failure to abide by policy." (Id. at 68). The officer could not recall, however, if he had ever written plaintiff up. (Id.)


## DISCUSSION

Following the trial, defendant moved to dismiss plaintiff's Complaint pursuant to Rule 12(b)(1) and (6) of the Federal Rules of Civil Procedure, or, in the alternative, for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.[11]


A. Motion to Dismiss

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, defendant moves to dismiss plaintiff's claims of assault and battery, intentional infliction of emotional distress and

---

[11] Although this Court has heard testimony in this case, this Court has nonetheless analyzed (1) defendant's motion to dismiss, (2) defendant's motion for summary judgment and (3) the evidence presented at trial. In analyzing defendant's motion to dismiss, this Court has considered only the allegations raised in plaintiff's Complaint; in analyzing defendant's motion for summary judgment, this Court has considered the pleadings submitted by the parties and the evidence exchanged during discovery, but not the evidence presented at trial.

14

negligent hiring, training and supervision for "failure to state a claim upon which relief can be granted." See Fed. R. Civ. P. 12(b)(6). (See also Def.'s Mem. at 6-9, 12-13, 15-18). Defendant also moves, pursuant to Rule 12(b)(1), to dismiss plaintiff's claim of negligent hiring, training and supervision for "lack of jurisdiction over the subject matter." See Fed. R. Civ. P. 12(b)(1). (See also Def.'s Mem. at 18-20).

1. Standards

a. Rule 12(b)(6)

When reviewing a motion to dismiss pursuant to Rule 12(b)(6), a court must accept the facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor. See Hernandez v. Coughlin, 18 F.3d 133, 136 (2d Cir.), cert. denied, 513 U.S. 836 (1994); see also Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 164 (1993). "In determining the adequacy of a claim under Rule 12(b)(6), consideration is limited to the facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." Allen v. WestPoint-Pepperell, Inc., 945 F.2d 40, 44 (2d Cir. 1991) (citation omitted). The complaint may be dismissed only where "'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" Id. (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)).

The Supreme Court has made it clear that a complaint filed by a pro se plaintiff is generally held to "less stringent standards than formal pleadings drafted by lawyers." Haines v. Kerner, 404 U.S. 519, 520 (1972) (per curiam). However, pro se complaints have been

dismissed where the pro se litigant has asserted a claim without supporting facts, see, e.g., Thomas v. Beth Israel Hospital Inc., 710 F. Supp. 935, 942 (S.D.N.Y. 1989); Wade v. Carey, 503 F. Supp. 25, 26 (S.D.N.Y. 1980), or where a statute or controlling precedent would clearly foreclose the proceedings. See, e.g., Love v. Coughlin, 714 F.2d 207, 208 (2d Cir. 1983).

Thus, mindful that the complaint of a pro se litigant should be held to a "less stringent standard," Haines v. Kerner, 404 U.S. at 520, this Court will liberally construe plaintiff's Complaint in an effort to determine if Mr. Brown has sufficiently alleged causes of action for (1) assault and battery; (2) intentional infliction of emotional distress; and (3) negligent hiring, training and supervision.

### b. Rule 12(b)(1)

When reviewing a facial challenge to subject matter jurisdiction pursuant to Rule 12(b)(1),[12] a court "'must look to the way the complaint is drawn to see if it claims a right to recover under the law of the United States.'" IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1055 (2d Cir. 1993), cert. denied, 513 U.S. 822 (1994) (citation omitted). "Dismissal for lack of jurisdiction is not appropriate merely because the legal theory alleged is probably false, but only because the right claimed is 'so insubstantial, implausible, foreclosed by prior decisions

---

[12] A party may make either a facial or a factual challenge to subject matter jurisdiction pursuant to Rule 12(b)(1). See 2 James Wm. Moore et al., Moore's Federal Practice ¶ 12.30[4] (3d ed. 2004). A facial attack "questions the sufficiency of the pleading," and a court reviewing a facial attack must accept the allegations in the complaint as true. Id. However, when a court is reviewing a factual attack, "the allegations have no presumptive truthfulness, and the court that must weigh the evidence has discretion to allow affidavits, documents, and even a limited evidentiary hearing to resolve disputed jurisdictional facts." Id. In the instant action, the government appears to be making a facial challenge to plaintiff's claim of negligent hiring, training and supervision. (See Def.'s Mem. at 18-20).

16

of this Court, or otherwise completely devoid of merit as not to involve a federal controversy.'" Id. (citation omitted) (internal quotation marks omitted).

In cases in which the court "relies solely on the pleadings and supporting affidavits, the plaintiff need only make a prima facie showing of jurisdiction." Robinson v. Overseas Military Sales Corp., 21 F.3d 502, 507 (2d Cir. 1994) (citation omitted). To determine whether the plaintiff has satisfied this burden, a court "will not draw 'argumentative inferences' in the plaintiff's favor" but will "construe jurisdictional allegations liberally and take as true uncontroverted factual allegations." Id. (citations omitted).

Accordingly, this Court "will accept the plaintiff's allegations as true, construing them most favorably to the plaintiff" in an effort to determine if Mr. Brown has sufficiently alleged that this Court has subject matter jurisdiction over his claim of negligent hiring, training and supervision. See 2 James Wm. Moore et al., Moore's Federal Practice ¶ 12.30[4].

## 2. Application

### a. The Federal Tort Claims Act

Under the FTCA, the United States may be held liable for money damages for the torts committed by its employees while acting within the scope of their office or employment. 28 U.S.C. § 1346(b)(1). Although the FTCA generally prohibits claims of assault and battery against the government, the FTCA explicitly provides that "with regard to acts or omissions of investigative or law enforcement officers of the United States Government, . . . any claim arising . . . out of assault, [or] battery" is permitted; "investigative or law enforcement officer" is defined as "any officer of the United States who is empowered by law to execute searches, to seize

evidence, or to make arrests for violations of Federal law." 28 U.S.C. § 2680(h); see Cuoco v. U.S. Bureau of Prisons, No. 98 CV 9009, 2003 WL 22203727, at \*4 (S.D.N.Y. Sept. 22, 2003) (providing that "[a]lthough assault and battery claims against the federal government are usually prohibited, the FTCA permits such claims where, as here, federal law enforcement officers are alleged to have committed assault or battery").

In determining the elements necessary to establish liability for any particular act, the FTCA makes it clear that a court must look to "the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1); see also Lambertson v. United States, 528 F.2d 441, 443 (2d Cir.), cert. denied, 426 U.S. 921 (1976). Thus, since the acts in this case occurred at the MDC in Brooklyn, New York, the Court must look to New York law to measure the government's conduct.

### b. Assault and Battery

Defendant contends that plaintiff has failed to prove the elements necessary to make out a prima facie case of assault and battery under New York law. (Def.'s Mem. at 6-9).

In United National Insurance Company v. Waterfront New York Realty Corporation, the Second Circuit defined "assault" under New York law as "an intentional placing of another person in fear of imminent harmful or offensive conduct." 994 F.2d 105, 108 (2d Cir. 1993) (citation omitted). A "battery" is defined as "an intentional wrongful physical contact with another person without consent." Id. "Assault and battery occurs when a person is placed in imminent apprehension of harmful or offensive bodily contact and there is an actual use of force." Cohen v. Davis, 926 F. Supp. 399, 402 (S.D.N.Y. 1996) (citing 6 N.Y. Jur. 2d Assault –

18

Civil Aspects § 1). In order to recover damages for battery, a plaintiff must "'prove that there was bodily contact, that the contact was offensive, and that the defendant intended to make the contact without the plaintiff's consent.'" Johnson v. Suffolk County Police Dep't, 245 A.D.2d 340, 341, 665 N.Y.S.2d 440, 440 (2d Dep't 1997) (citation omitted).

Construing the plaintiff's Complaint liberally, as this Court must, see Haines v. Kerner, 404 U.S. at 520, the Court finds that plaintiff has sufficiently alleged the elements necessary to state a cause of action for assault and battery under New York law. In his Complaint, plaintiff alleges that on three different occasions, Officer Farag "sexually assaulted the [p]laintiff during 'pat downs' at the MDC by grabbing and groping the [p]laintiff's crotch, including his penis and testicles." (Compl. ¶ 12). These allegations in Complaint state the necessary elements of an intentional bodily contact which was offensive and which occurred without plaintiff's consent. As such, these allegations, which are assumed to be true for purposes of defendant's motion to dismiss, see Hernandez v. Coughlin, 18 F.3d at 136, are sufficient to state a cause of action for assault and battery. Accordingly, this Court denies the government's motion to dismiss plaintiff's claim for assault and battery pursuant to Rule 12(b)(6).


c. Negligent Infliction of Emotional Distress

The government argues that plaintiff has failed to allege conduct that is sufficiently outrageous and extreme to support a claim of negligent infliction of emotional distress. (See Def.'s Mem. at 15-17).

To recover for intentional infliction of emotional distress, plaintiff must establish that defendant "'engaged in extreme or outrageous conduct which intentionally or recklessly caused

19

severe emotional distress to plaintiff.'" Impastato v. Hellman Enterprise, Inc., 147 A.D.2d 788, 789, 537 N.Y.S.2d 659, 661 (3d Dep't 1989) (citation omitted). Such a cause of action "requires proof of a traumatic event which caused the plaintiff to fear for his own safety." Id. at 790, 537 N.Y.S.2d at 662 (citation omitted). Plaintiff must demonstrate that "'the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" Murphy v. American Home Products Corp., 58 N.Y.2d 293, 303, 448 N.E.2d 86, 90, 461 N.Y.S.2d 232, 236 (1983) (citation omitted).

The incidents alleged in this action "fall far short of this strict standard." Id. If the conduct complained of had occurred outside of the prison setting, the incidents might have approached the required standard of "extreme and outrageous conduct." See Impastato v. Hellman Enterprise, Inc., 147 A.D.2d at 789, 537 N.Y.S.2d at 661. However, because the pat-searches at issue were conducted pursuant to established prison regulations, plaintiff has not sustained his burden of alleging extreme and outrageous conduct sufficient to satisfy the elements of an emotional distress claim. Accordingly, this Court dismisses plaintiff's claim of negligent infliction of emotional distress as a matter of law pursuant to Rule 12(b)(6).[13]

---

[13] The government also argues that plaintiff's claim for negligent infliction of emotional distress should be dismissed pursuant to Rule 12(b)(6) because plaintiff's claims for both negligent infliction of emotional distress and assault and battery are mutually exclusive. (Def.'s Mem. at 13-14). Since this Court dismissed plaintiff's claim of negligent infliction of emotional distress based upon plaintiff's failure to allege sufficiently extreme and outrageous conduct, the Court need not address defendant's additional argument in support of dismissal of this claim.

d. Negligent Training, Supervision and Hiring

Pursuant to Rule 12(b)(1), the government moves to dismiss plaintiff's claim of negligent training, supervision and hiring, arguing that the United States is immune to this claim under the FTCA. (See Def.'s Mem. at 18-20).

It is clear that "challenges to the personnel decisions of the United States are barred by the discretionary function exception to the FTCA." Cuoco v. U.S. Bureau of Prisons, 2003 WL 22203727, at *6 (citing 28 U.S.C. § 2680(a); United States v. Gaubert, 499 U.S. 315, 322-23 (1991)); see also Kenna v. United States, 927 F. Supp. 62, 64-67 (E.D.N.Y. 1996) (finding that the discretionary function exception bars claims of negligent hiring, retention and supervision). The Second Circuit has held that Section 2680(h) of the FTCA "prohibits claimants from clothing assault and battery actions in the garb of negligence by claiming negligent failure to prevent the attack." Johnson v. United States, 788 F.2d 845, 850 (2d Cir.), cert. denied, 479 U.S. 914 (1986).

In the instant action, there is no allegation that any similar complaints have been made against Officer Farag or that the BOP officials who hired and supervised Officer Farag knew or should have known that the officer would engage in the alleged conduct. Moreover, regardless of the allegations in the Complaint, it is clear that plaintiff's claim is precluded by the discretionary function exception to the FTCA. See Cuoco v. U.S. Bureau of Prisons, 2003 WL 22203727, at *6. Accordingly, plaintiff's claim of negligent supervision, training and hiring is unavailing and is dismissed pursuant to Rule 12(b)(1).[14]

_____

[14] The defendant also seeks to dismiss plaintiff's cause of action for negligent training, supervision and hiring under Rule 12(b)(6), claiming that plaintiff cannot recover for such a claim because Officer Farag did not commit an intentional tort. (Def.'s Mem. at 12-13).

## B. Motion for Summary Judgment

Defendant also moves for summary judgment on plaintiff's cause of action for assault and battery, arguing that there is no issue of material fact in dispute. (See Def.'s Mem. at 10). Specifically, defendant argues that because Officer Farag was operating pursuant to federal regulations, the doctrine of qualified immunity protects the government from liability. (See id. at 10-12).

### 1. Standards

It is well-settled that a party moving for summary judgment has the burden of establishing that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Thompson v. Gjivoje, 896 F.2d 716, 720 (2d Cir. 1990) (quoting Fed. R. Civ. P. 56(c)). Since summary judgment is an extreme remedy, cutting off the rights of the non-moving party to present a case to the jury, see Egelston v. State Univ. College at Geneseo, 535 F.2d 752, 754 (2d Cir. 1976); Gibralter v. City of New York, 612 F. Supp. 125, 133-34 (E.D.N.Y. 1985), the court should not grant summary judgment unless it is clear that all of the elements have been satisfied. See Auletta v. Tully, 576 F. Supp. 191, 195 (N.D.N.Y. 1983), aff'd, 732 F.2d 142 (2d Cir. 1984). In addition, "'the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion.'" Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986) (quoting United States v. Diebold, Inc., 369

Because this Court dismissed plaintiff's claim for negligent training, supervision and hiring pursuant to Rule 12(b)(1), this Court need not address defendant's argument that this claim should be dismissed pursuant to Rule 12(b)(6).

U.S. 654, 655 (1962)).

Once the moving party discharges its burden of proof under Rule 56(c), the party opposing summary judgment "has the burden of coming forward with 'specific facts showing that there is a genuine issue for trial.'" Phillips v. Kidder, Peabody & Co., 782 F. Supp. 854, 858 (S.D.N.Y. 1991) (quoting Fed. R. Civ. P. 56(e)). Rule 56(e) "provides that a party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading." Anderson v. Liberty Lobby, Inc., 477 U.S. at 256. Indeed, "the mere existence of some alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. Id. at 247-48.

In reversing a grant of summary judgment, the Second Circuit noted that the "[t]rial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material facts to be tried, not to deciding them." Quaratino v. Tiffany & Co., 71 F.3d 58, 65 (2d Cir. 1995) (quoting Gallo v. Prudential Residential Services, Ltd. Partnership, 22 F.3d 1219, 1224 (2d Cir. 1994)).

### 2. Application – Qualified Immunity

The government argues that the doctrine of qualified immunity protects the government from tort liability because Officer Farag acted in accordance with the federal regulations set forth in the Manual. See Cuoco v. U.S. Bureau of Prisons, 2003 WL 22203727, at *5; see also Arteaga v. State, 72 N.Y.2d 212, 216, 527 N.E.2d 1194, 1196, 532 N.Y.S.2d 57, 59 (1988) (citation omitted) (holding that the doctrine of qualified immunity protects government officials and the government from tort liability "except when there is bad faith or the action taken is

23

without reasonable basis"). The question "is whether an objectively reasonable officer . . . would have understood [that] his or her conduct violated [a] clearly established constitutional right." Abreu-Guzman v. Ford, 241 F.3d 69, 73 (1st Cir. 2001) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818-19 (1982)). "Evidence concerning the officer's 'subjective intent is simply irrelevant' to a qualified immunity defense." Id. (citing Crawford-El v. Britton, 523 U.S. 574, 591 (1998)).

It is well-established that "[n]ot every common law tort committed by a law enforcement officer gives rise to a constitutional claim." Friedman v. Young, 702 F. Supp. 433, 436 (S.D.N.Y. 1988) (citations omitted). In determining whether a corrections officer's conduct violated an individual's due process rights, the Second Circuit held that the test is whether the conduct "shocks the conscience." Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir.), cert. denied, 414 U.S. 1033 (1973) (citing Rochin v. California, 342 U.S. 165, 172 (1952)). The court in Friedman v. Young held that "the line between a pat down and a fondle is too insubstantial to support the burden of supporting a claim for constitutional tort." 702 F. Supp at 436.

Similarly, the court in Williams v. Kane analyzed an allegation of sexual abuse by a corrections officer in the context of a Section 1983 Eighth Amendment claim, finding that that the "alleged 'punishment' must be 'objectively, sufficiently serious' . . . . [and] the prison official involved must have a 'sufficiently culpable state of mind.'" No. 95 CV 379, 1997 WL 527677, at *9 (S.D.N.Y. Aug. 25, 1997) (quoting Boddie v. Schnieder, 105 F. 3d 857, 861 (2d Cir. 1997)). With respect to the subjective prong of the test, the Second Circuit has held that "[w]here no legitimate law enforcement or penological purpose can be inferred from the defendant's alleged conduct, the abuse itself may, in some circumstances, be sufficient evidence of a culpable state of mind." Boddie v. Schnieder, 105 F.3d at 861 (citing Hudson v. McMillian,

24

503 U.S. 1, 6-7 (1992)).

Based upon the pleadings submitted and the evidence exchanged during discovery, this Court is unable to determine whether Officer Farag's conduct was such that an "objectively reasonable officer" should have known that the conduct violated a "clearly established constitutional right." See Abreu-Guzman v. Ford, 241 F.3d at 73. A genuine issue of material fact exists regarding the scope of Officer Farag's actions during the alleged incidents and whether these actions rise to the level of an assault and battery. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 256. Accordingly, this Court denies defendant's motion for summary judgment on plaintiff's claim of assault and battery.

## C. Evidence Presented at Trial

Based upon the evidence presented at trial, neither side disputes that some form of physical contact occurred between Officer Farag and plaintiff, one of the elements necessary to establish an assault and battery. The corrections officer was required to and admits that he did touch plaintiff's body in order to conduct a pat-search. (See Tr. at 52-55). The question is whether the contact was objectively "offensive." See Johnson v. Suffolk County Police Dep't, 245 A.D.2d at 341, 665 N.Y.S.2d at 440. The contact "'must be one which would offend the ordinary person . . . not unduly sensitive as to his personal dignity. It must, therefore, be a contact which is unwarranted by social usages prevalent at the time and place at which it is inflicted.'" Cohen v. Davis, 926 F. Supp. at 402 (citation omitted).

Defendant contends that even if plaintiff's allegation that Officer Farag touched plaintiff's crotch is true, touching an inmate's crotch is "a necessary part of performing a pat

25

search" (Def.'s Mem. at 7), and was done in conformity with BOP regulations. (Id. at 6). The Manual instructs that when conducting a pat-search, an officer should "[s]earch [the] front and inside of each leg separately by running [his] hands down from the waist to the feet, paying special attention to the inmate's lower abdomen and crotch . . . ." (Def.'s Ex. A § V(E)(2)(h)(3)). The Manual also admonishes officers to "carefully check[ ] seams, waistbands, zippers and buttons." (Id.)

Plaintiff asserts that Officer Farag's conduct was not done in conformity with BOP regulations and contends that the officer's pat-search was offensive even in the context of a prison pat-search. Although plaintiff concedes that he had been pat-searched before by several other officers, Mr. Brown testified that he had not been pat-searched in "that way" before the incidents at issue and "felt that it was out of the norm and [Officer Farag] had abused his position, sort of like an abuse of power." (Tr. at 9).

It is clear that pat-frisks are "necessary to prison administration and that the 'execution of policies and practices by prison administrations is to be accorded deference by the judiciary.'" Webb v. Foreman, No. 93 CV 8579, 1997 WL 394957, at *3 (S.D.N.Y. July 7, 1997) (citing Grummett v. Rushen, 779 F.2d 491, 493 (9th Cir. 1985)). According to the Manual, pat-searches may be conducted "anywhere and at any time" (Def.'s Ex. A § V(E)(1)(b)(1)), and are conducted to "protect staff and inmates by detecting and preventing the movement of contraband within the institution." (Id. § V(A)).

Indeed, Officer Farag testified that he had confiscated contraband from plaintiff on "multiple occasions" (Tr. at 55), and plaintiff conceded that the officer had removed food items from his pocket on at least one occasion. (See id. at 14). Plaintiff also admitted that he had been

26

pat-searched by "several different" duty officers when leaving from the unit, "whether I was going to work or whether I was going to some program that I was involved with." (Id. at 9). Mr. Brown claims, however, that the incident on December 9, 1998 was "my first time actually being pat-searched . . . coming back into the unit by the actual duty officer on the unit." (Id.) There is nothing in the Manual that prohibits such a pat-search and indeed, the Manual makes it clear that pat-searches may be conducted "anywhere and at any time." (Def.'s Ex. A § V(E)(1)(b)(1)). Thus, there is no issue as to the appropriateness of the timing of Officer Farag's alleged pat-searches of plaintiff.

On the other hand, while "[t]here is no dispute that pat searches are necessary to prison administration," prisoners do not "'forfeit all constitutional protections by reason of their conviction and confinement in person.'" Webb v. Forman, No 93 CV 8579, 1996 WL 596515, at *4 (S.D.N.Y. Oct. 17, 1996) (citations omitted). "[A] pat frisk can become unreasonable, and therefore violate the Fourth Amendment, based on the way in which it is conducted." Id. (citation omitted). The reasonableness of a particular pat-frisk depends on "'the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place it is conducted.'" Id. (quoting Grummitt v. Rushen, 779 F.2d 491, 495 (9th Cir. 1985)).

Here, as noted above, the officer was justified in conducting a pat-search of plaintiff upon his return to the unit from outside the institution; the search was conducted in the presence of other people; and the search was generally conducted in accordance with the Manual. The only remaining issue is whether Officer Farag went beyond the proper boundaries of the search and essentially "fondled" plaintiff.

While it is clear that a pat-search in and of itself does not constitute an assault and battery

27

in the context of a prison setting, see Webb v. Forman, 1996 WL 596515, at *4, there may be instances where the "touching" of the inmate during pat-search is beyond what is necessary or permitted under the circumstances. See id. Here, plaintiff has alleged such an instance, claiming that Officer Farag's search was "more aggressive" than necessary (Tr. at 10), and was in the nature of "groping." (Id. at 15, 17). Plaintiff claims that Officer Farag "paid a lot more attention to my groin area than anything else, and in the way that he ran his hands . . . . He ran his hand vertically like this here up the crack of my ass in a motion where it was more aggressive than actually feeling to see if something was there" and that the officer "grabbed my groin." (Id. at 10-11).

That conclusion, however, does not end this Court's inquiry. The Court must still determine whether plaintiff sustained his burden of proving that Officer Farag's conduct deviated from the procedure outlined in the Manual. As noted above, plaintiff testified that he had been pat-searched by "several different" duty officers (id. at 9), and Officer Farag testified that he conducted the pat-searches of Mr. Brown in accordance with the Manual. (Id. at 54-55).

In evaluating plaintiff's testimony, the Court is mindful that plaintiff bears the burden of proving the elements of his claim by a preponderance of the evidence. Having listened to the testimony of both plaintiff and Officer Farag, this Court finds plaintiff's testimony to be sincere in that plaintiff believes the pat-searches at issue went beyond the normal procedure. (See, e.g., Tr. at 9 (testifying that "I felt that [the pat-search] was out of the norm")).

However, the officer was equally sincere in his testimony that he did not search plaintiff in a manner that was any different from the way he searched every other inmate and that his search of plaintiff did not deviate in any way from the procedures set forth in the Manual. (Id. at

28

54-55). Although Officer Farag admitted that when conducting a pat-search, an officer's hands could come into contact with an inmate's buttocks or groin area (id. at 51), he emphatically denied groping plaintiff in his groin area or running his hand in between plaintiff's buttocks. (Id. at 77-78). Moreover, while the officer did not recall any specific occasion on which he searched Mr. Brown (id. at 54), he did recall that "Mr. Brown was completely irritated every time I searched him and complained about it." (Id. at 55).

Plaintiff conceded that he did not submit a written complaint at the time of the incidents[15] (id. at 16); nor did he complain to any MDC staff member at the time of the incidents at issue. (Id. at 40-41). Following the second alleged incident, Mr. Brown spoke to the social worker on duty for unit but did not "tell[] him what was going on." (Id. at 17). Other than the counseling ordered by the Probation Department after his release, plaintiff did not seek medical or psychological treatment for the alleged incidents either at the time of the incidents or after his release from MDC. (Id. at 40-41). Accordingly, there are no contemporaneous records that reflect the incidents or that provide corroborating evidence of plaintiff's claims.

Also, although the pat-frisks at issue were conducted in the open and in the presence of other inmates (see id. at 8-9, 13, 18), plaintiff failed to call any inmates or prison employees as

---

[15] Mr. Brown waited almost a week before he submitted his first BP-9 on December 18, 1998, complaining about the pat-search treatment. (Tr. at 23-24; see also Pl.'s Exs. 1, 2). In this first BP-9, plaintiff complains that Officer Farag's "pat downs [have] been more like feel ups or gropes" and claims that "[Lieutenant] Nared, [Lieutenant] Little and [Lieutenant] Bynum are aware of this sensitive situation [involving the alleged incidents with Officer Farag]." (Pl.'s Ex. 1 at 2). In a second B-9, dated December 30, 1998, Mr. Brown alleges that "[o]n 12/16/98[,] I wrote a cop out to [Lieutenant] Nared (which has not been returned). [On] 12/17/98, I wrote a cop out to [Lieutenant] [L]ittles (which has not been returned)." (Pl.'s Ex. 2 at 1). The "cop outs" dated December 16, 1998 and December 17, 1998 were not submitted into evidence during the trial; accordingly, it is unclear what allegations plaintiff set forth in these documents.

29

witnesses to corroborate his account of the incidents at issue. Similarly, there was no evidence presented to the Court that would suggest that any other inmates complained about Officer Farag's methods of conducting pat-searches, and plaintiff has not offered any reason for Officer Farag's alleged decision to single plaintiff out for this particular form of harassment. Since there is no evidence to corroborate plaintiff's claims, the question comes down to an assessment of the competing testimony of plaintiff and of the officer.

Based on all the evidence presented at trial and the Court's assessment of the demeanor of the witnesses as they testified, this Court concludes that plaintiff has failed to sustain his burden of proving by a preponderance of the evidence that he was subjected to an intentional assault and battery by Officer Farag. Instead, the Court finds that while plaintiff testified sincerely, plaintiff, who had never previously been arrested or incarcerated (see id. at 4), may have been unduly sensitive to the pat-search routine. Accordingly, while there may have been a difference in degree between Officer Farag's approach to the search and the approach of other corrections officers, the Court finds that the pat-searches at issue do not rise to the level of an assault and battery in the context of prison confinement.

## CONCLUSION

Accordingly, this Court grants defendant's motion to dismiss plaintiff's claim of intentional infliction of emotional distress pursuant to Rule 12(b)(6); grants defendant's motion to dismiss plaintiff's claim of negligent hiring, training and supervision pursuant to Rule 12(b)(1); denies defendant's motion to dismiss plaintiff's claim of assault and battery pursuant to Rule 12(b)(6); and denies defendant's motion for summary judgment on plaintiff's claim of

assault and battery.

Based on the evidence presented at trial and the demeanor of the trial witnesses, this

Court finds that Officer Farag's conduct was in conformity with federal regulations.

Accordingly, the Court enters judgment in favor of defendant with respect to plaintiff's claim of

assault and battery.

**SO ORDERED.**

Dated: Brooklyn, New York
April 21, 2005

Cheryl L. Pollak
United States Magistrate Judge